UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges McCullough, Decker and Senior Judge Annunziata


SOPHIA MARQUITA SHADLEY

MEMORANDUM OPINION*

v.      Record No. 1582-14-1
PER CURIAM
FEBRUARY 24, 2015

NORFOLK DEPARTMENT OF HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
John R. Doyle, Judge

(Elizabeth M. Wood, on brief), for appellant.

(Bernard Pishko, City Attorney; Heather L. Kelley, Assistant City
Attorney; Anna H. Myers, Guardian *ad litem* for the minor child;
Myers & Delpierre, PLC, on brief), for appellee.


Sophia Marquita Shadley (mother) appeals an order terminating her parental rights to her

child. Mother argues that the trial court erred by terminating her parental rights pursuant to Code

§ 16.1-283(B) and (C) because

> the efforts by Appellant which included securing employment,
> graduating high school, attending with regularity parenting classes,
> and meeting with the child biweekly far outweighed any evidence
> presented by the [Norfolk] Department [of Human Services (the
> Department)] because the evidence presented by the Department
> could be attributed to her relative youth and shoddy upbringing;
> two things which she demonstrated she could overcome.

Upon reviewing the record and briefs of the parties, we conclude that this appeal is without

merit. Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible from the evidence. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the evidence proved that mother was sixteen years old when she gave birth to her child in 2012. Mother and the child lived in a two-bedroom home with approximately eleven other people. On October 9, 2012, mother and the five-month-old baby visited the putative father, who was a minor and in foster care. The foster mother saw mother give the baby Nyquil cold medicine in his bottle because he was crying. The foster mother told mother that she could not give the baby Nyquil and asked her to leave. Mother "began crying, saying that she was going to kill herself and kill the baby." Mother eventually left the home, but continued to call and text the putative father to tell him that she was going to kill herself. The foster mother called child protective services.

The Department removed the baby and placed him in foster care on October 10, 2012. Mother subsequently entered foster care on November 30, 2012. The Department provided her with numerous services, including independent living services, a life skills coach, and an allowance. The Department referred mother for a psychological evaluation, counseling, and parenting classes.

Jacqueline Butler, a licensed clinical social worker, was mother's counselor from October 2012 until June 2013. Mother was diagnosed with major depression disorder, oppositional defiant disorder, and post-traumatic stress disorder. Butler explained that she had three goals for mother's therapy, which included reducing the symptoms of depression, examining the triggers and the impact of post-traumatic stress disorder, and developing a behavior structure modification plan. While in therapy, mother made "very minimal" progress on her goals. Butler

testified that mother was not ready to take on the responsibility of parenting. Mother did not have a good parenting role model. Additionally, according to Butler, mother's parenting decisions were based on her "street knowledge" or "what she thinks is right based on what someone else may have told her that may have been of her age." Further, Butler testified that mother was not ready to take on the role of parenting because of her

> [p]oor decision-making, lack of adequate knowledge of developmental milestones, and things that's [sic] needed to parent a child. In addition to that, her defiancy, her determination to do things her way, and a major barrier is her decision-making and the type of men she would have around her child as well as her lack of stability with housing.

Mother regularly visited with the child while he was in foster care. However, she did not show that she could successfully care for the child. She did not know how to care for the child when he was crying or frustrated, nor did she know how to engage in age-appropriate activities with the child during visitation. She also disobeyed the Department's rules during visitation and took him to a park at night.

In addition, mother started dating a man who was a sex offender. Both the social worker and Butler told mother that she should not be dating him and explained how her decisions about who she dated could affect the child. Mother became defiant. She was eighteen years old at the time. She told the social worker, "I don't tell you who to date, and you're not going to tell me who to date." The social worker tried to talk with mother about her choices, but on January 14, 2014, mother signed herself out of foster care even though she could have stayed in foster care until she was twenty-one years old.

Once mother left foster care, she did not have stable housing. She stayed with a friend in public housing, although she was not allowed to do so because she was not on the lease. Mother lost her Medicaid benefits and her ability to receive her medication and therapy. The social

worker provided her with information regarding how she could apply for Medicaid, but she did not do so.

On May 23, 2014, the Norfolk Juvenile and Domestic Relations District Court terminated mother's parental rights. Mother appealed. On August 14, 2014, the circuit court heard evidence and argument. The court found that it was in the child's best interests to terminate mother's parental rights pursuant to Code § 16.1-283(B) and (C)(2). This appeal followed.

ANALYSIS

Mother argues that the trial court erred in terminating her parental rights to her child. She explains that she was sixteen years old when she gave birth. She had a difficult childhood and was abused. Despite her difficulties, mother graduated high school and was enrolled in community college. She had a part-time job and was living with a friend. She completed her parenting classes and attended visitations. Mother asserts that since she made these efforts, the trial court should not have terminated her parental rights.

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted). When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

- 4 -

The trial court terminated mother's parental rights pursuant to Code § 16.1-283(B)[1] and (C)(2).[2] "[S]ubsection B [of Code § 16.1-283] 'speaks prospectively' and requires the circuit court to make a judgment call on the parent's ability, following a finding of neglect or abuse, to substantially remedy the underlying problems." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 270-71, 616 S.E.2d 765, 772 (2005) (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

> [S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Id. at 271, 616 S.E.2d at 772 (quoting Winslow, 40 Va. App. at 562-63, 580 S.E.2d at 466).

---

[1] Code § 16.1-283(B) states a parent's parental rights may be terminated if:

> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and

> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

[2] A court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2).

When the child and mother entered foster care, the Department provided numerous services. However, as the trial court noted, mother made little progress in therapy, and then, she stopped going to therapy when she left foster care. Further, although mother visited with the child regularly, her visits were for one hour, every other week, and never increased in number. She did not progress. The trial court found that mother "demonstrated an inability to care for [the child] even for a few hours exercising judgment" and an "inability to provide for his safety."

In addition, the trial court stated that mother's decision to leave foster care in order to continue to date someone the Department did not approve of made her priorities clear. The trial court explained "that was a decision that indicated louder than anything else that she just wasn't going to take the steps or wasn't able or in a place in her life to take the steps to make becoming a parent . . . a priority in her life."

At the time of the hearing, the child had been in foster care for approximately twenty-two months. Mother did not have suitable housing. She continued to date someone who was a sex offender and did not understand the effect it could have on her child. She stopped therapy and her medications. The evidence proved that mother had not made progress in her parenting skills. In short, mother had not substantially remedied the conditions that led to the child being in, and remaining in, foster care.

"It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The trial court did not err in terminating mother's parental rights pursuant to Code § 16.1-283(B) and (C)(2).

## CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed.  Rule 5A:27.

Affirmed.